UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

COLLEEN McTAGUE STORRS,      :      Case No. 1:15-cv-136
     :
     Plaintiff,      :      Judge Timothy S. Black
vs.      :
     :
UNIVERSITY OF CINCINNATI,      :
     :
     Defendant.      :

**ORDER
GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT (Doc. 50)**

## I.      INTRODUCTION

This civil case is before the Court on the motion of Defendant University of

Cincinnati ("UC") for summary judgment (Doc. 50) as well as the parties' responsive

memoranda (Docs. 70, 72).

In 2007, Plaintiff Colleen McTague Storrs ("Dr. McTague") was hired as a tenure-

track Assistant Professor in UC's Geography Department. Dr. McTague successfully

applied for reappointment in 2009 and 2011, though multiple faculty members expressed

concerns about Dr. McTague's lack of research and publications during both

reappointment evaluations. In 2013, UC denied Dr. McTague's third application for

reappointment, citing her lack of publications.

On February 24, 2015, Dr. McTague filed the Complaint. The Complaint alleges

that UC violated Title VII of the Civil Rights Act of 1964 by denying Dr. McTague's

2013 application for reappointment because of her gender and in retaliation for Dr.

McTague complaining of gender discrimination.  The Complaint further alleges that UC violated the Equal Pay Act ("EPA") by paying Dr. McTague less than male Assistant Professors.  Finally, the Complaint alleges that UC violated the Family & Medical Leave Act ("FMLA") by interfering with Dr. McTague's FMLA leave during the 2011-2012 academic year and by allegedly denying Dr. McTague's 2013 application for reappointment in retaliation for her taking FMLA leave.

For the following reasons, the Court **GRANTS** UC's motion for summary judgment as to Dr. McTague's claims for Title VII discrimination, Title VII retaliation, FMLA interference and FMLA retaliation, and **DENIES** UC's motion as to Dr. McTague's claim for violation of the EPA.

## II.    FACTS

### A.  UC's appointment process.

At UC, the process of faculty applying for reappointment, promotion and tenure ("RPT") is governed by a document established for each department in UC's College of Arts & Sciences (the "RPT document") which is also adopted by each department consistent with the negotiated collective bargaining agreement between UC and the union for its faculty members, the American Association of University Professors (AAUP). (Doc. 65 at ¶ 77).

The Geography Department's RPT document states, in relevant part, that "[a] recommendation for reappointment, with the exception of field service and adjunct faculty, should imply the likelihood of achieving tenure: aptitude or promise should be the initial considerations, but with an ultimate insistence on demonstrated achievement."

(Doc. 39-2 at 65). The Geography Department's RPT document states that recommendations affecting Assistant Professors should reflect on the areas of research, teaching, service, and professional development. (*Id.* at 65-67).

In terms of "research," the Geography Department's RPT document states that reviewers should consider, *inter alia*: "The establishment of an active research program involving projects that are likely to result in publication." (Doc. 39-2 at 65). The document does not list a specific number of publications that would qualify as an "active research program."

**B. Dr. McTague's education history and professional background.**

Dr. McTague attended high school in Utah and attended Brigham Young University and the University of Utah before graduating with a Bachelor of Science degree in Geography around 1976. (Doc. 65 at ¶ 1). Dr. McTague worked as a secondary education teacher for three to four years, and moved with her family from Utah to New Orleans and Nebraska before returning to school in a Master's program at the University of Nebraska around 1992. (*Id.* at ¶ 2). After a year at the University of Nebraska, she moved with her family to Cincinnati because of her husband's job. (*Id.* at ¶ 3).

Dr. McTague obtained her Master's degree in Geography from UC around 1999. (Doc.65 at ¶ 4). Dr. McTague obtained her Doctorate in Geography from UC in 2004. (*Id.* at ¶ 5).

In 2004, Dr. McTague was offered and accepted a position at UC as a "Field Service Assistant Professor" (without tenure), for a three-year term. (Doc. 65 at ¶ 8).

During her three-year appointment, Dr. McTague also served as Director of Undergraduate Studies. (*Id.* at ¶ 13).

### C. Dr. McTague is hired as a tenure-track faculty member in 2007.

Around August 9, 2007, UC offered Dr. Mc Tague a position as a tenure-track Assistant Professor in the Geography Department. (Doc. 70-2 at ¶ 2; Doc. 39-1 at 16). The annual salary offered by UC, and accepted by Dr. McTague, was $52,000. (Doc. 39-1 at 16). Dr. McTague does not remember if the position was part of a competitive search or if there was a search committee, but she did not think there was a search for the position, and she did not remember interviewing for the position. (Doc. 39 at 40-41). Dr. McTague testified that her tenure-track Assistant Professor position involved different responsibilities than her field service position: she would have time to do research in her tenure-track role, whereas the field service position was focused on teaching and "no research." (*Id.* at 41:16-24).

In October, 2007, shortly after Dr. McTague was hired as a tenure-track professor, Dr. Valerie Hardcastle (Dean of the College of Arts & Sciences) sent an email to the Department Heads in the College of Arts & Sciences that Dr. Liu (Department Head of the Geography Department) circulated to the Geography Department faculty members, including Dr. McTague. (Doc. 65 at ¶ 32). Dean Hardcastle's email stated that "some faculty [at UC] are not pulling their weight," and reiterated that UC is "a research intensive university and research is an expectation of all tenured and tenure track faculty[.]" (Doc. 39-1 at 18).

Around December 6, 2007, Dr. McTague met with Dr. Liu to discuss her performance evaluation. (Doc. 65 at ¶ 36). Their meeting was later summarized in a memorandum signed and dated January 7, 2008. (Doc. 39-1 at 20). Dr. Liu stated in the memorandum:

> I emphasized to Colleen the importance of publications in her future RPT evaluation, which she is fully aware. She recognizes that it is important that she has articles accepted for publication by the time she comes up for reappointment. As of now, she has not submitted any articles. However, she has indicated that she will devote more time in writing papers during the winter quarter.

(Doc. 39-1 at 20).

### D. Dr. McTague successfully applies for reappointment in 2009.

On or around May 15, 2008, Dr. McTague met with Dr. Liu for her annual review. (Doc. 65 at ¶ 55). The review stated that Dr. McTague's performance was "excellent" in the areas of teaching and service. (Doc. 39-1 at 42). The review noted that Dr. McTague had not published any papers during her first academic year and had not submitted any papers for publication. (*Id.*) The review stated Dr. McTague's research projects were "in their early stages and have not led to publications yet," but that she was "encouraged to submit her research findings for publication." (*Id.*). The review stressed the importance of research in reappointment evaluations:

> She had not submitted any articles for publication at the time of this meeting. She expressed her commitment to devote more time in writing papers in the immediate future. She is full aware of the importance of publications in her future RPT evaluations.

(*Id.*)

In early 2009, as part of her reappointment application, Dr. McTague noted in her self-evaluation that her research was bare as a result of transitioning from a field service position:

> There are disadvantages and advantages associated with beginning a new assistant professor position at a research institution without an established agenda. The three primary and dominant disadvantages are obvious: No publications, no publications in the pipeline and no research ready to begin the pipeline.

(Doc. 39-2 at 15).

On February 26, 2009, the Geography Department RPT committee recommended Dr. McTague for a three-year reappointment. (Doc. 39-2 at 38-40). The committee noted that Dr. McTague's transition from field service Assistant Professor to Assistant Professor "required that Dr. McTague radically revise her role in the department from one that focused exclusively on teaching and service to one that now includes research in addition to teaching and service." (*Id.* at 38) The Geography Department RPT committee opined that Dr. McTague was making "good progress" in balancing the three obligations. (*Id.*) The committee praised Dr. McTague's "high quality, innovative, student-oriented teaching" and her commitment to students. (*Id.*) The committee commended Dr. McTague for making "credible progress in building a viable research program," as well as attracting over $100,000 in grants. (*Id.* at 39) Still, the committee noted that:

> A careful reading of Dr. McTague's annual performance reviews clearly shows that there is a concern that she begin to translate her research into published articles on a regular basis. The RPT committee shares that concern and urges Dr. McTague to continue to readjust her deep

commitment to teaching and service so that she has adequate time to devote to writing up her research.

(*Id.* at 40).

On March 2, 2009, Dr. Liu concurred with the RPT committee. (Doc. 39-2 at 41). Dr. Liu stated "Dr. McTague's performance is excellent in the areas of teaching and service[.]" (*Id.* at 42). While Dr. Liu stated Dr. McTague's research is "starting to show promise," and that she has made "concerted efforts in advancing her research," he also expressed concern that none of her projects had "led to publication," stating:

I am somewhat concerned that the dossier shows no articles in review and little evidence of any articles in progress. This concern is raised in the RPT committee's recommendation as well. In my meeting with Dr. McTague in December of 2007, I was pleased that she expressed her commitment to devote more time in writing papers in the immediate future. She is fully aware of the importance of publications in her future RPT evaluations.

(*Id.* at 42). Dr. Liu concluded that a three-year reappointment, as suggested by the Geography Department RPT committee, should allow Dr. McTague time to establish her publication record. (*Id.*)

On April 15, 2009, the College of Arts & Sciences RPT committee followed both prior recommendations and recommended a three-year appointment. (Doc. 39-2 at 52).

On May 8, 2009, Dean Hardcastle issued her letter on Dr. McTague's application. (Doc. 39-2 at 80). Dean Hardcastle noted that Dr. McTague has a "strong record" in the areas of teaching and service. (*Id.*). Dean Hardcastle said it was "understandable" that Dr. McTague had been slow to develop a research record due to her transition from a field service position, but stated that she "share[s] the concerns of the department head and the RPT committee, however, that she has no publications and no scholarship

7

submitted for publication." (*Id.*) Dean Hardcastle recommended reappointment for a two-year term, and expressly stated that "[t]o merit a second reappointment, however, [Dr. McTague] will have to demonstrate substantial progress in her research and in her rate of peer-reviewed publication."

On August 28, 2009, Provost Anthony Perzigian approved the two-year term recommended by Dean Hardcastle. (Doc. 39-2 at 86). The Provost commended Dr. McTague on her "demonstrated teaching excellence and [her] extensive service." (*Id.*) The Provost, too, expressed concern about her research:

> A successful dossier for promotion and tenure must contain evidence of documented accomplishment in the areas of teaching, professional activity, and service consistent with your unit's reappointment, promotion, and tenure criteria. I wish to commend your demonstrated teaching excellence and your extensive service. However, as you look toward that next dossier, I strongly encourage you to focus on your research agenda; translating your research into a faster publication rate—especially in high-impact scholarly venues; and seeking external funding for your research. Toward those ends, I encourage you to reexamine the balance between your commitments to research and to service so that you can devote sufficient time, energy, and focus to achieving the research requirements of your unit's RPT criteria.

(*Id.* at 86).

### E. Dr. McTague successfully applies for reappointment in 2011.

Around June 10, 2010, Dr. Liu completed and signed an annual performance evaluation for Dr. McTague. (Doc. 39-3 at 1). The review noted that Dr. McTague had her first article accepted for publication:

> Dr. McTague should be congratulated for having an article forthcoming in *Dialectical Anthropology*. She also had one article in review in *Urban Geography*, and three articles in progress. She continued to be active in presenting her research at professional meetings.

(*Id.*)  Dr. Liu noted that he "hopes this marks the beginning of a long period of sustained publications" and that Dr. McTague's "teaching load will remain 4 courses and service load will remain low next year, so she continue to focus on research and publication." (*Id.*)

In early 2011, Dr. McTague submitted her dossier in support of her application for reappointment.  (Doc. 65 at ¶ 106).  On February 4, 2011, the Geography Department RPT committee recommended that Dr. McTague be appointed for another two-year term. (Doc. 39-3 at 32).  The committee commended Dr. McTague for continuing "to be a great asset to the department and its students through her teaching and mentoring activities." (*Id.*)  The committee expressed concern, however, that Dr. McTague's "rate of publication may not be sufficient to allow her to meet the Department's RPT criteria for tenure and promotion:"

> Dr. McTague had a Field Service Assistant Professor Appointment in the department from September 2004 through September 2007 during which time she had a heavy teaching load and served as Director of Undergraduate Studies.  During that time she honed her skills as a teacher and mentor and made extraordinary contributions towards overhauling the undergraduate major and generating student interest in geography.  In September 2007, Dr. Mctague's [sic] appointment was changed to that of a tenure-track Assistant Professor.  Since that time she has continued to be a great asset to the department as reflected in glowing student evaluations of her courses and nomination by students for several awards, most recently (currently) for the A.B. Cohen Award for Excellence in Teaching.  During the past three years she has supervised more undergraduate capstone theses than all other faculty combined, advised 5 students through the completion of Master's degrees, and is currently advisor to 7 graduate students.  She remained Director of Undergraduate Studies until September 2008, at which point she reluctantly stepped down under the advice of the Department Head so that she could focus more on developing a research program.

Dr. McTague was reappointed for 2 years as a tenure-track Assistant Professor beginning September 2010. During the February 2009 department review for that reappointment, both the RPT committee and department head noted that Dr. McTague had not yet developed a substantive research program as reflected in an absence of published or submitted articles. In her self-evaluation, Dr. McTague noted that the transition from her field service to tenure-track status had been difficult, including having to disengage herself to a greater extent from her deep involvement in the undergraduate program, including only belatedly stepping down as Director of Undergraduate Studies. She also noted that she needed to essentially start a research program from scratch which further slowed her progress in this area. Since that time, Dr. McTague has clearly begun to develop several research projects, secured a modest amount of funding to support some of this effort, and generated several papers presented at professional meetings, one published and one in-press article, and a draft manuscript for an invited chapter in an edited volume. She has several other article manuscripts in various stages [sic] preparation and a contract for a book. The committee acknowledges that his work represents significant positive steps towards the development of a sustained program of high quality and scholarly productivity. Nevertheless, the majority of the committee expressed serious concern whether or not her current rate of scholarly output, as measured in publications, will be sufficient to meet requirements for promotion and tenure in two years time.

(*Id.* at 32-33). The committee concluded that Dr. McTague should "further focus on her research and publication efforts in order to increase her productivity in this area in years to come." (*Id.* at 33).

On February 4, 2011, Dr. Nicholas Dunning forwarded the Geography Department RPT committee's letter to Dr. McTague. (Doc. 39-3 at 37). Dr. McTague responded: "Thank you, Nick, for the letter. It sounds like I should probably start looking for another job or just retire." (*Id.*)

On February 11, 2011, Dr. Liu concurred with the Geography Department RPT committee's recommendation. (Doc. 39-3 at 34). Dr. Liu praised Dr. McTague's

performance in regards to teaching and service, but shared the committee's concern

regarding her rate of publication:

> The appointment of Dr. McTague as tenure track assistant professor in September, 2007, marks a major change in her career. Prior to this appointment, her main focus had been in teaching and service. The tenure track appointment requires her to establish a research agenda and publish her research in scholarly outlets. In my meeting with Dr. McTague in December of 2008, I was pleased that she expressed her commitment to devote more time in writing papers in the immediate future. She was fully aware of the importance of publications in her future RPT evaluations. Knowing her deep commitment to teaching and service, I relieved her, starting September, 2008, from serving as the director of undergraduate studies and reduced her teaching load. During the process of evaluating her reappointment in 2009, the department RPT committee and myself were concerned that Dr. McTague had no scholarly publications. Since then, Dr. McTague has made concerted efforts in publishing her research. Her dossier indicates that she has one article published in *Dialectical Anthropology* and another accepted by *Urban Geography*. In addition, she has a book chapter in review and several articles in various stages of preparation. These are encouraging accomplishments for Dr. McTague. However, with this rate of publication, I share the Department RPT committee's concern that she may not be able to demonstrate a record of sustained high quality research and publication by the time she applies for promotion and tenure.

(*Id.* at 35).

On April 21, 2011, the College of Arts & Sciences RPT committee concurred with

both prior recommendations, but echoed its concerns regarding Dr. McTague's

publications: "[Dr. McTague] has been slow to develop a record of research and scholarly

publication, and may be falling behind the trajectory needed for tenure, as noted in both

letters from the department RPT committee and head." (Doc. 39-4 at 12). The

committee concluded:

Ultimately, the committee felt that Dr. McTague deserved the opportunity to regain lost momentum and meet the department requirements for promotion and tenure, and voted 8-1 in support of the recommendations of the department RPT committee and head for reappointment for a two year term. We hope the candidate will use this opportunity and make every effort to establish a sustained record of publication in this term, so that she will be able to meet the department expectations for promotion and tenure.

(*Id.*)

On June 2, 2011, Dean Hardcastle departed from all three prior levels of review and recommended that Dr. McTague <u>not</u> be reappointed. (Doc. 39-4 at 32). Dean Hardcastle recommended against appointment because Dr. McTague's research performance is "far below what we would expect" from a tenure-track faculty member completing her fourth year. (*Id.* at 33). Dean Hardcastle opined that Dr. McTague's research in the time since her 2009 reappointment was insufficient to warrant reappointment:

In recommending her for reappointment in 2009, I indicated that, to merit a second reappointment, she would "have to demonstrate substantial progress in her research and in her rate of peer-reviewed publication." In the past two years, she has published one co-authored, peer-reviewed article (in *Dialectical Anthropology*) and has a second in press (at *Urban Geography*). She has presented six papers since 2008 at the Annual Meeting of the Association of American Geographers. She also lists a book chapter as forthcoming and a book manuscript as under contract with the Cincinnatus Association, a local organization of which she is a member. Because such a book does not meet the department's criteria for publications in "outlets sponsored by such scholarly and scientific organizations as university presses, professional associations, and research institutes," I am surprised that Professor McTague has been encouraged to proceed with this project. I certainly share the view of the department head that her "rate of publication may not be sufficient to allow her to meet the Department's RPT criteria for tenure and promotion." Indeed, **I do not see any realistic way in which Professor McTague will be able to fulfill tenure and promotion requirements during the next two years**.

(*Id.* at 32) (emphasis added).

On June 15, 2011, Dr. Dunning, Dr. Roger Selya, Dr. Robert South, and Dr. Susanna Tong emailed Provost Santa Ono a written objection to Dean Hardcastle's recommendation. (Doc. 39-4 at 34). These faculty members stated that Dr. McTague's transition to a tenure track faculty position "initially proved rather difficult because Dr. McTague had become so deeply involved in the undergraduate program and only reluctantly, and somewhat belatedly, gave up that directorship and reduced her teaching load in order to jumpstart her own research endeavors." (*Id.* at 35). The June 15, 2011 letter argued that "the Department's RPT document underscores several criteria for reappointment/promotion; research is one criterion, but we also highly value quality teaching, mentoring and service to the University and community. On the latter, Dr. McTague's performance has been stellar and her efforts should be recognized and rewarded." *Id.*

On August 22, 2011, Provost Ono issued a decision, departing from the recommendations at all four prior levels of review, and awarding a one-year reappointment. (Doc. 39-4 at 43). Provost Ono commended Dr. McTague for her accomplishments in teaching and service. (*Id.*). Provost Ono stated:

> At the same time, your peers and all previous reviewers of your dossier express serious concerns about your record of research and scholarship, and I share those concerns. Most specifically, your attention to your scholarship needs to address concerns raised by Dean Hardcastle about your book project with the Cincinnatus Association when she notes that this project fails to meet departmental criteria for publication in "outlets sponsored by such scholarly and scientific organizations as university presses, professional associations, and research institutes." Future dossiers should document and demonstrate that the Cincinnatus Association project

indeed meets those criteria; for instance, you might demonstrate that its review process is comparable in scholarly rigor to that of the other organizations mentioned in the criteria. Alternatively, you might seek to place this manuscript—or other manuscripts that would build the record of research and scholarship in relation to the criteria—in other outlets that are clearly scholarly and scientific.

At this time, then, I agree with the college RPT committee that you deserve "the opportunity to regain lost momentum and meet the departmental requirements for promotion and tenure . . ." I am also encouraged by the support that you are getting from your Department, through a reduction in your service obligations and teaching duties. **A successful dossier for subsequent reappointment must contain heightened evidence of achievement in research consistent with your unit's reappointment, promotion, and tenure criteria.**

(Doc. 39-4 at 43) (emphasis added).

On the same day, Dr. McTague forwarded the email with the Provost's letter and recommendation to Dr. South, Dr. Tong, Dr. Selya and Dr. Dunning, thanking them for their "efforts in [sic] my behalf." (Doc. 39-4 at 41).

### F. Dr. McTague takes FMLA and sick leave during the 2011-2012 academic year.

On April 6, 2011, Dr. Tong informed Dr. McTague that she was arranging a meeting with Dr. Dunning, Dr. Selya and Dr. South to see if they could "come up with something to help [Dr. McTague] AND the Department." (Doc. 39-4 at 7). Dr. McTague thanked Dr. Tong for her concern. (*Id.*). Dr. Tong responded:

Don't thank me; I have not done anything!

Anyway, after we met, I was thinking about the options that we have.

PLEASE, please, don't feel offended; I am just trying to brain storm and come up with some options so that we can further explore them, and see if we can make it work. Please let me know which of these following options are acceptable to you and which one(s) is(are) totally out:

1. postpone the application of tenure till [sic] your 7th year to buy more time
2. take a family leave (reason: you need to take care of Bruce) to buy some time[1]
3. collaborate with somebody to speed up the research project; the goal is to get the two papers out ASAP, and embark on a short project and get a publication or two out in a year or so
4. change to another position in the Department, a position that is not so research demanding and is based more on teaching and service, such as Field Service, Visiting Assistant Professor, Lecturer, or something?? (I know it will be difficult for you, but at least you don't have to leave, and you will be doing something that you are good at and enjoy)

Please let me know your thoughts.  If you can think of any other options that you would like to pursue, please add them on the list.  Hopefully, we can identify some feasible avenues, and when the four of us meet on Friday/Monday, we will have at least some discussion points.

(Doc. 39-4 at 8).

On August 26, 2011, Dr. McTague emailed a letter to Department Head Dr. Liu, requesting FMLA leave beginning September 19, 2011, with an estimated return date of January 1, 2012.  (Doc. 39-4 at 48-50).  Dr. Liu approved the request the following day.  (*Id*.)  Dr. McTague's leave was later extended through the entirety of the 2011-2012 academic year, as she was able to receive additional sick leave through the AAUP "sick leave bank."  (Doc. 65 at ¶ 142).

Because Dr. McTague was on leave for the entire 2011-2012 academic year, she was not required to apply for reappointment in February, 2012.  (Doc. 65 at ¶ 143).  On

---

[1] Dr. McTague's husband, Bruce Storrs, M.D., was diagnosed with Non-Hodgkin Lymphoma in 2006 and experienced relapses in 2008, 2009, and 2011.  (Doc. 70-2 at ¶¶ 12-14).

February 29, 2012, Dr. McTague was formally notified that (1) she was approved for a one-year extension of her tenure "probationary period" (which extended her tenure "track" until August, 2014) and (2) she would be reviewed for reappointment in the spring of 2013. (Doc. 40-1 at 13-14).

While on leave, Dr. McTague did not teach any classes. (Doc. 40 at 193). No one from UC told Dr. McTague to meet with students, though she occasionally met with students because she did not perceive them to be receiving the assistance they required in her absence. (Doc. 39 at 305-309). No one told Dr. McTague she was required to attend faculty meetings, though she occasionally voluntarily attended meetings to "keep up with the department." (Doc. 40 at 193). Dr. McTague testified she should not have attended these meetings, but she "didn't understand FMLA clearly." (Doc. 39 at 315). Dr. McTague did not know, and could not remember, if any professor in the Geography Department told her she needed to work on her RPT folder while on FMLA or sick leave. (Doc. 39 at 317).

On September 7, 2011, Dr. McTague corresponded by email with Deborah Herman, her AAUP union representative. (Doc. 39-5 at 7). Dr. McTague stated that she was under the impression she was supposed to "report things" to Ms. Herman while she was on leave. (*Id.*) Over the course of a few emails, Ms. Herman informed Dr. McTague that she did not have to report to her, because Dr. McTague's leave had already been approved, and Ms. Herman's "official involvement (so to speak) in the case is over." (*Id.*) Ms. Herman concluded: "On a personal level, what I hope is that you will be taking

care of yourself and your husband, and using the time to recover and make progress on your RPT folder." (*Id.* at 9). As Dr. McTague recognized, Ms. Herman is not her supervisor. (Doc. 39 at 317).

### G. Dr. McTague complains about the Geography Department and requests a transfer.

In March, 2012, Dr. McTague contacted John Bryan in the Provost's office to discuss a potential transfer to the Political Science Department. (Doc. 65 at ¶ 152; Doc. 40 at 37-38). Dr. McTague knew Dean Hardcastle was leaving her position and wanted to submit the matter to the new incoming Dean, Ron Jackson. (Doc. 65 at ¶ 154). On or around July 24, 2012, Dr. McTague met with Dean Jackson about her request for a transfer and prepared a three-page memorandum that she submitted to him. (*Id.*)

On June 1, 2012, Dr. McTague complained to Dr. Tong about several issues within the Geography Department, including that Dr. Liu treated Dr. McTague unfairly by giving her higher teaching and service assignments compared to male professors, and that Dr. Richard Beck called her a "lazy bitch," treated her like the "secretary" of the office, and physically threatened her. (Doc. 70-2 at ¶¶ 24-25). Dr. Tong and Dr. McTague discussed the possibility of Dr. McTague transferring from the Geography Department to the Political Science Department. (*Id.* at ¶ 26).

On July 26, 2012, UC Assistant General Counsel Doug Nienaber emailed, *inter alia*, Dr. Tong, Dr. Liu, and John Bryan. (Doc. 67-1 at 18). Mr. Nienaber stated:

> I received a call today from Professor Tong, the incoming Department Chair in Geography (A&S), relaying her concern that Professor McTague is planning to sue the University of Cincinnati over her tenure denial.

(Doc. 67-1 at 18).

On August 1, 2012, Mr. Bryan forwarded this email to Dean Jackson. (Doc. 67-1 at 17). Dean Jackson responded:

> Wow! I have never heard of suing someone in advance of damages. It is as though she has no intent of working hard to achieve the tenure standards at this point. Unbelievable. I really want her to succeed with getting tenure. We will do all we can in the college to support her in her quest for tenure. Of course with this being her penultimate year we will haver [sic] act quickly to help in whatever way we can.

(Doc. 67-1 at 17). Dr. McTague was ultimately not transferred to the Political Science Department.[2]

### H. The Memorandum of Understanding.

In August, 2012, Dean Jackson appointed Dr. Jana Braziel as an Associate Dean to assist him, and one of her first assignments was to help prepare a "Memorandum of Understanding" for Dr. McTague. (Doc. 65 at ¶ 156). Dr. Braziel consulted with Dr. Tong, who had been appointed as Interim Department Head for the Geography Department, since Dean Jackson wanted Dr. McTague to have significant releases from her service and teaching responsibilities. (*Id.* at ¶ 159). On or around September 10, 2012, Dr. McTague met with Dr. Tong and signed the Memorandum of Understanding. (Doc. 40 at 127-29). Dr. McTague did not speak to Dr. Braziel, Dean Jackson, Deborah

---

[2] Dr. McTague claims that Dean Jackson "elected to reject [her] request for a transfer and instead tasked Associate Dean Braziel and Tong with preparing a Memorandum of Understanding" shortly after the August 1, 2012 email. (Doc. 70-3 at ¶ 48). While it is clear Dr. McTague did not transfer to the Political Science Department, Dr. McTague's statement of facts (Doc. 70-3) does not point to evidence stating when exactly Dean Jackson denied the request or that Dean Jackson considered the Memorandum of Understanding to be an alternative to (or in response to) Dr. McTague's request to transfer.

Herman, or any fellow Geography professors about the Memorandum of Understanding before signing it. (*Id*. at 129-130).

The Memorandum of Understanding states that, to "facilitate [Dr. McTague's] progress toward fulfilling the departmental requirements, specifically scholarly research and publications requirements, for tenure and promotion in the Department of Geography," UC is offering (1) a two-class teaching release in the 2012-13 and 2013-14 academic years with two consecutive semesters of full teaching release in spring 2013 and fall 2013, and (2) a full release from service commitments for two academic years (fall 2012-spring 2014). (Doc. 40-2 at 51).

The Memorandum of Understanding reiterates that, because Dr. McTague was granted a one-year stay of the tenure clock as a result of her one-year leave, Dr. McTague's appointment was extended until August 31, 2014. (Doc. 40-2 at 51). The MOU states that Dr. McTague will have to submit her RPT portfolio for reappointment in spring 2013 (with a decision forthcoming by August, 2013), and submit the RPT portfolio for final promotion and tenure review by fall, 2013. (*Id.*)

The Memorandum of Understanding states:

We are offering the two consecutive semesters of teaching release and service reduction in order to promote your scholarly program and to foster your success in meeting the criteria for promotion and tenure as outlined for teaching, service, and research in the Faculty Reappointments, Promotions, and Tenure Criteria and Procedures, which was approved and adopted by the Department of Geography on January 2, 2002 and which was approved and adopted with revision on April 12, 2005.

We hope only for your success in this endeavor; and we hope that the teaching release and service reduction will enable you the requisite time to complete the six working research papers—currently listed as "in process"

19

on your curriculum vitae—and publish these papers as articles in peer-reviewed, prominent academic journals in the field (as your c.v. indicates that you plan to do).

(Doc. 40-2 at 51).

## I. Dr. McTague's 2013 application for reappointment is denied.

On October 11, 2012, Dr. McTague returned to full-time work in the Geography Department. (Doc. 65 at ¶ 169).

In February, 2013, Dr. McTague submitted her application for reappointment. Prior to submitting her dossier, Dr. McTague submitted two more articles to refereed journals. (Doc. 70-2 at ¶ 31). One of these articles was accepted for publication on July 12, 2013, and ultimately published in October, 2013. (*Id.*) Accordingly, at the time Dr. McTague submitted her application for reappointment in February, 2013, she had published two articles in the five years she was a tenure-track Assistant Professor.[3] (Doc. 70-2 at ¶ 30).

On February 25, 2013, the Geography Department RPT committee recommended that Dr. McTague not be reappointed. (Doc. 40-2 at 61). The vote was 7-2. (*Id.*)

Consistent with practically every recommendation regarding Dr. McTague since 2009, the majority stated that Dr. McTague's performance in the areas of teaching, service, and professional development meets (and in some cases exceeds) expectations, but her "performance in research falls short of what is stipulated in the RPT document." (Doc. 40-2 at 61). Specifically, the majority opined that the low number of Dr.

---

[3] The Court notes that fall 2007 through spring 2013—minus the 2011-2012 academic year Dr. McTague was on leave—is five academic years.

McTague's publications, and the low quality of those publications, rendered it "unlikely" she would achieve tenure in 2014:

> The majority has noted that inadequate research performance is a recurring problem in Dr. McTague's evaluations. In particular, in his Aug 12, 2011 reappointment letter, Provost Santa Ono states that he is reappointing Dr. McTague for one year despite negative recommendations at "all previous levels of review" to give her an additional opportunity to show "evidence of achievement in research consistent with your unit's RPT criteria." In the majority opinion no such achievement is evidence. The 2005 RPT document requires "A record of sustained high quality research and publication directed to a professional audience, indicative of a commitment to research and its publication in refereed journals." Under professional publications, Dr. McTague's CV lists two articles (one published in Dec. 2010 and one in press from Aug. 2011) in refereed journals and a single monograph published in 2000. The 2000 monograph has 38 pages of tables and charts, and reports overall survey results. There is no statistical analysis (just percentage of voters indicating a preference), no maps or spatial analysis, and no references. A search on Google Scholar yields no citations. In the majority opinion this monograph cannot be considered as a peer-reviewed publication. The 2010 article is a brief 6-page paper with a single Google Scholar citation (to the abstract). It was published in a special issue of journal *Dialectical Anthropology* which has a very low SJR impact factor of 0.18. The 2011 article is to be published in the journal *Urban Geography* which has a low SJR impact factor of 0.89. The RPT document states that "A recommendation for reappointment, with the exception of field service and adjunct faculty, should imply the likelihood of achieving tenure." It is the majority opinion that, in the fact of inadequate research and publication record, the likelihood of Dr. McTague achieving tenure (she is due for tenure review by the fall 2013 according to the Aug 29, 2012 MOU) is slim. This holds true even under the most optimistic scenario that assumes that her two manuscripts, recently submitted to higher impact factor journals (one to *Political Geography* submitted on Feb 14, 2013) and another to *Applied Geography* submitted on Feb 17, 2013), will eventually be published. Regretfully, given her research and publication record, the majority cannot recommend Dr. McTague for reappointment.

(Doc. 40-2 at 61-62).

The minority opinion acknowledged Dr. McTague had a "poor publication record," but opined that, given Dr. McTague's most recent submissions, her excellence in teaching and service, and difficult circumstances in her life, recommended that she have additional time to develop her research agenda and build her publication record. (Doc. 40-2 at 62).

On March 16, 2013, Dr. Tong, now Interim Geography Department Head, issued a letter agreeing with the Geography Department RPT committee. Dr. Tong stated:

> Our Work Load Policy, which was approved with revisions on April 11, 2006, states that "…the minimum rate of publication for an active research program is on average one article – lead author or co-author, in referred journals (or equivalent) per year." *This implies that she needs to have at least six (6) peer reviewed articles in reputable journals published by the time when she applies for tenure.* Comparing her research accomplishment with our Work Load Policy and RPT criteria, her paucity of scholarly publication in peer-reviewed journals, even if her two recently submitted papers are accepted, does not bode well for "the establishment of an active research program. . ." as specified in our RPT document.

(Doc. 40-2 at 83). Dr. Tong concluded:

> Although Dr. McTague has a good record in teaching and service, she has not met the standards of research required in the Department. In her last reappointment letter in 2011, Provost Ono stated that, "A successful dossier for subsequent reappointment must contain heightened evidence of achievement in research consistent with your unit's reappointment, promotion and tenure criteria." Unfortunately, the deliverables are not here. I therefore concur with the committee's recommendation and do not recommend the reappointment of Dr. Colleen McTague.

(Doc. 40-2 at 83).

On April 15, 2013, the College of Arts & Sciences RPT committee departed from the prior two recommendations, and recommended that Dr. McTague be reappointed for another year. (Doc. 40-3 at 1). The committee noted that Dr. McTague's 2011

reappointment came with an expectation of "heightened evidence of research," and Dr. McTague's work in the interim had satisfied that criteria. (*Id.*)

On May 17, 2013, Dean Jackson issued a letter recommending that Dr. McTague not be reappointed. (Doc. 40-3 at 1). Dean Jackson's recommendation was based on the fact that Dr. McTague had not published any articles since executing the Memorandum of Understanding and, in his opinion, she would not be in a position to submit a successful tenure application in a year's time:

> As a means of supporting [Dr. McTague], I co-developed with her department head Susanna Tong an MOU dated August 29, 2012 that gave her a full release from teaching in spring 2013, and a full release from service for two years starting in August 2012. She taught two courses in fall 2012 and taught nothing in spring 2013. This release from service and partial release from teaching over the last 8 months was designed as a means of giving her space to move at least 2-4 of the 8 papers she lists on her CV as being in progress out of her hands, in review, and accepted for publication. Each manuscript in progress was at varying levels of completion in August. At that time I cautioned Dr. McTague that she would need to get something published in order for me to support her for reappointment. Nothing was published during that time frame. Instead, since her appointment as a tenure-track assistant professor in 2007, she has only produced two journal articles. This is not sufficient progress to place her up for tenure this fall. The external reviews would not be favorable with so few publications.

(Doc. 40-3 at 3).

On August 5, 2013, Provost Beverly Davenport issued her final review of Dr. McTague's reappointment dossier, informing her that she did not approve her reappointment, "due primarily to lack of publication." (Doc. 40-3 at 9). The letter informed Dr. McTague that her appointment with UC would end effective August 14, 2014. (*Id.*)

On May 28, 2014, Dr. McTague filed a charge of discrimination with the Equal Employment Opportunity Commission.  (Doc. 40-3 at 15).

**J.  Other Professors.**

The nature of Dr. McTague's claims requires a comparison between Dr. McTague and several male faculty members in UC's Geography Department.

### 1.  *Dr. Changjoo Kim.*

On March 12, 2008, UC hired Dr. Changjoo Kim as a tenure-track assistant professor in the Geography Department.  (Doc. 65 at ¶ 45).  Dr. Kim's salary was $66,000.  (Doc. 39-1 at 32).  At the time he was hired by UC, Dr. Kim was in a tenure-track position at Minnesota State.  (Doc. 65 at ¶ 49).  Dr. Hardcastle, the Dean of the College of Arts & Sciences at the time, testified that, in order to hire Dr. Kim, UC "would have to beat" the salary he was receiving at Minnesota State.  (Doc. 43 at 71-72).  Dr. Liu recommended that Dr. Kim received a $66,000 salary.  (Doc. 48 at 19).  Dr. Liu testified that the salary "was based on [Dr. Kim's] merit.  He was Assistant Professor at another university and he had a strong record of accomplishments, including publications."  (*Id.* at 15).

Dr. Kim was granted tenure in 2012.  (*See* Doc. 48 at 61-62; Doc. 48-1 at 43).  During his time as a tenure-track Assistant Professor at UC, he published five journal articles.  (Doc. 70-3 at ¶ 52; Doc. 70-1 at 16).

### 2.  *Dr. Richard Beck.*

In February, 2009, UC hired Dr. Richard Beck as a tenure-track assistant professor in the Geography Department at a salary of $68,000.  (Doc. 65 at ¶ 60; Doc. 68-1 at 116).

Dr. Beck had been a research faculty member at UC on and off for approximately 10 years.  (Doc. 46 at 10-11).  Dr. Liu and Dr. Hardcastle discussed the appropriate level of compensation for Dr. Beck.  (Doc. 43 at 10).  Dr. Liu testified that Dr. Beck's salary was "based on the merit.  Richard Beck had a long list of publications.  He also had several large research grants."  (Doc. 48 at 23).

Dr. Beck was granted tenure in 2011.  (Doc. 46 at 9).  At the time he applied for tenure, he had published two journal articles while on tenure-track at UC.  (Doc. 44 at 116).

### 3. *Dr. Widener.*

Dr. Michael Widener was hired as a tenure-track assistant professor in 2012 at a salary of $70,000.  (Doc. 48 at 45-46; Doc. 68-1 at 118).  Dr. Widener was hired from a position as a doctoral student; at the time of his offer, he had not received his Doctorate degree.  (Doc. 68-1 at 118).

## III.    STANDARD

A motion for summary judgment should be granted if the evidence submitted to the Court demonstrates that there is no genuine issue as to any material fact, and that the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986);  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party has the burden of showing the absence of genuine disputes over facts which, under the substantive law governing the issue, might affect the outcome of the action.  *Celotex*, 477 U.S. at 323.  All facts and inferences must be

construed in a light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).

A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (1986).

## IV.    ANALYSIS

### A.  Title VII claims.

#### 1.  *Failure to exhaust administrative remedies.*

UC argues that portions of Dr. McTague's Title VII claim are barred by her failure to exhaust administrative remedies. (Doc. 50 at 41-42). The Court agrees.

Failure to timely exhaust administrative remedies is an appropriate basis for dismissal of a Title VII action. *Williams v. Northwest Airlines, Inc.*, 53 F. App'x 350, 351 (6th Cir. 2002). To exhaust administrative remedies, a plaintiff must file a charge with the EEOC within 300 days after the alleged unlawful employment practice occurred. *See* 42 U.S.C. § 2000e-5(e). Once the EEOC dismisses the charge and issues a right-to-sue letter, the plaintiff has ninety days to file a civil action. *See* 42 U.S.C. § 2000e-5(f)(1).

Here, Dr. McTague filed her EEOC charge on May 28, 2014. (Doc. 40-3 at 15). Accordingly, Dr. McTague has only exhausted her administrative remedies in regards to events which occurred in the 300 days preceding May 28, 2014. 42 U.S.C. § 2000e-5(e).

Dr. McTague has identified a number of grievances related to her employment at UC, including being assigned a higher course load than her male colleagues, being

treated "like a secretary," and being yelled at by Dr. Beck.  However, the only alleged

adverse employment action, that occurred after August 1, 2013, was the denial of her

reappointment on August 5, 2013.

For purposes of clarifying the issues to be presented: the only employment action

the Court will consider in evaluating Dr. McTague's Title VII claims is the denial of her

application for reappointment in 2013.[4]

### 2. *Gender Discrimination.*

#### a.  Dr. McTague's *prima facie* case fails.

Dr. McTague claims that UC violated Title VII by denying her 2013 application

for reappointment because of her gender.

Title VII prohibits employers from discriminating "because of…race, color,

religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  In a Title VII case, a plaintiff

bears the ultimate burden of persuading the fact-finder that the defendant intentionally

discriminated against her.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143

(2000).  A plaintiff may carry the burden by: (1) introducing direct evidence which shows

that in treating a plaintiff adversely, the defendant was motivated by discriminatory

intent; or by (2) introducing circumstantial evidence that supports an inference of

discrimination.  *Logan v. Denny's Inc.*, 259 F.3d 558, 566-67 (6th Cir. 2001).

Here, Dr. McTague does not present any direct evidence of discrimination.

Accordingly, she must establish a *prima facie* case through circumstantial evidence.

---

[4] The Court notes that Dr. McTague has acknowledged "The adverse act at issue in [Dr. McTague's] claims for both sex discrimination and retaliation is Dr. McTague's August 2013 non-renewal."  (Doc. 70 at 36).

A plaintiff may establish a *prima facie* claim of discrimination by producing circumstantial evidence that satisfies the familiar four-part *McDonnell Douglas* test. *See Birch v. Cuyahoga County Probate Court*, 392 F.3d 151, 173 (6th Cir. 2004). Under this test, a plaintiff must show that: (1) she was a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) a similarly-situated person outside the protected class received more favorable treatment. *Id.* (citation omitted).

Here, UC argues Dr. McTague cannot demonstrate the fourth prong, *i.e.*, she cannot show that any similarly-situated male faculty members were treated more favorably. (Doc. 50 at 33). The Court agrees.

In order for a plaintiff to demonstrate that a non-protected employee is "similarly situated," he must "prove that all of the relevant aspects of his employment situation were 'nearly identical' to those of [the non-protected employee's] employment situation." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (quotation omitted). Further, the individuals with whom the plaintiff seeks to compare her treatment must have "dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* (quotation omitted).

Federal courts which have considered Title VII discrimination claims in the context of a denial of tenure have required plaintiffs to show the supposedly "similarly situated" comparator is nearly identical in all factors of employment, including, *inter*

*alia*, education, experience, and research productivity. [5] *See Hellmann-Blumberg v. Univ. of the Pac.*, No. 2:12-cv-286, 2014 U.S. Dist. LEXIS 35345, at * 12 (E.D. Cal. Mar. 13, 2014) ("In determining whether parties are similarly situated, the Court looks to specific statistical data relating to the objective criteria for tenure, including education, experience, and number of published works as compared to others who had been granted tenure.").

Along these lines, courts have required plaintiffs to show that the <u>quality</u> <u>and</u> the <u>quantity</u> of their publications are similar to the alleged comparator. *See Liggitt v. Wash. State Univ.*, No. C13-5176, 2014 U.S. Dist. LEXIS 25418, at * 22 (W.D. Wash. Feb. 26, 2014) (plaintiff could not prove she was similarly situated to other professors without evidence of "the substance or reviews of their tenure application" and "the quality or quantity of their scholarship."); *McFadden v. State Univ. of N.Y.*, 195 F. Supp. 2d 436, 454 (W.D. N.Y. 2002) (female plaintiff in a Title VII gender discrimination case could not show she was similarly situated to a male professor who achieved tenure because "[t]he problem was [plaintiff's] scholarship and lack of publication" and "[t]here is no evidence that [comparator's] qualifications in that regard were similar to plaintiff's"); *Chambers v. Ind. State Univ.*, No. TH 98-8 C M/H, 2000 U.S. Dist. LEXIS 20551, at * 31 (S.D. Ind. Mar. 8, 2000) (plaintiff could not establish *prima facie* case of racial discrimination because "[plaintiff] has not shown that Caucasian professors were granted promotion or tenure despite similar deficiencies in their research performance.").

---

[5] While this case involves Plaintiff's denial of reappointment, as opposed to denial of tenure, the RPT document states that reappointment "should imply the likelihood of achieving tenure." (Doc. 39-2 at 65). Accordingly, the Court finds cases involving the denial of tenure persuasive.

The Sixth Circuit has expressly held a plaintiff must establish that her "research and situation" were "nearly identical" to the proposed comparator:

> [Comparator] published an article in the most prestigious journal in his field, presented a number of papers, and demonstrated intellectual independence. [Plaintiff], on the other hand, published articles in less scholarly journals and Dr. Mueller repeatedly criticized her for not completing more work independently. While perhaps trivial to the outside world, these relatively minor differences provide sufficient reasons in the academic realm for the discrepancy between the two professors. Thus, we find that [Plaintiff] has not established a prima facie case because her research and situation were not "nearly identical" to that of [Comparator].

*Stein v. Kent State Univ.*, No. 98-3278, 1999 U.S. App. LEXIS 9152, at ** 16-17 (6th Cir. May 11, 1999).

Here, Dr. McTague merely alleges she is similarly situated to Dr. Beck, Dr. Kim and Dr. Widener because they served under Department Head Dr. Liu and because they were evaluated under the Geography Department RPT document based on teaching, service, research and professional development. (Doc.70 at 56). This argument fails. Dr. McTague has not set forth any evidence, or even argument, indicating that the quantity and quality of her research was comparable to Dr. Kim, Dr. Beck, and Dr. Widener. Dr. McTague does not provide any evidence or argument from which the Court could conclude that her publications performance—two articles published in five years at the time of her 2013 application for reappointment; three articles published in the six years she was on tenure track—was "nearly identical" to Dr. Beck's two articles in the two years he was on tenure track or Dr. Kim's five articles in the four years he was on tenure track.

Second, Plaintiff's argument fails to take into account any "different . . . circumstances that would distinguish" UC's treatment of these alleged comparators. *See Ercegovich*, 154 F.3d at 352. Concerns regarding Dr. McTague's research productivity were documented at four of five levels of review during her application for reappointment in 2009 and at all five levels of review in 2011. In 2011, Provost Ono expressly warned Dr. McTague that her next application for reappointment "must contain heightened evidence of achievement." (Doc. 39-4 at 43).

There is no evidence that Dr. Beck, Dr. Kim, or Dr. Widener had a history of concerns regarding their rate of publication and no evidence they received a warning that their applications for tenure or reappointment had to contain "heightened" achievement. In the Court's view, these are "different circumstances" that would distinguish UC's treatment of Dr. McTague from its treatment of the alleged comparators.

For these reasons, Dr. McTague has not made a *prima facie* case of discrimination. She has simply not shown that she is similarly situated to any of the male professors in the Geography Department who, she alleges, received more favorable treatment.

### b. UC has a legitimate, non-discriminatory reason.

Even assuming, *arguendo*, Dr. McTague had presented a *prima facie* case, that would not end the inquiry—the burden would shift to UC to articulate a non-discriminatory reason for its decision. *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1082 (6th Cir. 1994).

As indicated by the final decision issued by Provost Davenport on August 5, 2013, as well as the recommendations from the Geography Department RPT committee,

Interim Department Head Dr. Tong, and Dean Jackson, Dr. McTague's 2013 application

for reappointment was denied due to lack of publication.  This constitutes a legitimate,

non-discriminatory reason for the denial of her application.  *See Lynn v. Regents of Univ.*

*of Cal.*, 656 F.2d 1337, 1344 (9th Cir. 1981) ("Without doubt, deficient scholarship is a

legitimate, nondiscriminatory reason to deny salary increases or tenure.").

### c. Dr. McTague cannot show pretext.

In response, Dr. McTague must now come forward with sufficient evidence which

could support a finding that UC's rationale was pretextual.  *Manzer*, 29 F.3d at 1083

(citation omitted).   Dr. McTague may show this either by directly evidencing that a

discriminatory reason "more than likely motivated the employer" or by indirectly

showing that UC's proffered explanation is "unworthy of credence."  *Day v. Board of*

*Trustees of Cleveland State Univ.*, No. 89CV0046, 1994 U.S. Dist. LEXIS 21353, at * 7

(N.D. Ohio Mar. 8, 1994).  Specifically, Dr. McTague's evidence:

> must show more than a denial of tenure in the context of disagreement
> about the scholarly merits of the candidate's academic work, the
> candidate's teaching abilities or the academic needs of the department or
> university.  Absent evidence sufficient to support a finding that such
> disagreements or doubts are influenced by forbidden considerations such as
> sex or race, universities are free to establish departmental priorities, to set
> their own required levels of academic potential and achievement and to act
> upon the good faith judgments of their departmental faculties or reviewing
> authorities.

*Id.* at * 5 (citation omitted).

First, Dr. McTague argues she was subject to an arbitrary and heightened

publications standard compared to other male professors.  (Doc. 70 at 63).  Dr. McTague

argues that Dr. Tong and Dr. Stepinski claimed she needed six articles by the time she

applied for tenure, whereas Dr. Beck testified she needed five, while other Department members imposed a seven-publication requirement.  (*Id.*).  Dr. McTague argues there is no evidence that male professors in the Geography Department were ever subject to a five, six, or seven-publication requirement, and, accordingly, UC's proffered reason is pretext for discrimination.  (*Id.*)

The Court does not agree.  This Court has expressly held that <u>even if</u> the subjective criteria in a reappointment or tenure decision is "ignored or misapplied" by reviewing faculty members, that alone cannot show a university's otherwise legitimate reason is pretext for discrimination.  *See Doucet v. University of Cincinnati*, No. 1:05-cv-148, 2006 U.S. Dist. LEXIS 29022, at * 57 (S. D. Ohio July 19, 2006) (Dlott, J).  Instead, a plaintiff must show evidence that the alleged errors were the <u>result</u> of unlawful discrimination.  *Id.*

In *Doucet*, the plaintiff (Doucet) was a French national and an assistant professor at UC's School of Design.  *Id*. at ** 1-2.  UC denied Doucet's application for reappointment due to Doucet's failure to demonstrate "satisfactory teaching" as required by the School of Design's RPT document.  *Id.* at * 31.  Doucet sued UC, claiming the university had violated her Title VII rights to be free from discrimination on account of national origin.  *Id.* at * 47.  Specifically, Doucet argued that UC's proffered reason was pretext for discrimination because UC ignored or misapplied relevant RPT criteria and because the review process was tainted with irregularities including the consideration of artificially depressed evaluations.  *Id.* at ** 57-60.  The Court rejected this argument

because there was no evidence that these issues were the result of national-origin discrimination:

> While Doucet contends that UC's application of the RPT criteria was distorted by discriminatory bias and thus pretextual, the circumstantial evidence on this point is insufficient to lead any reasonable jury to so conclude. Significantly, although the University Faculty Grievance Committee concluded that Doucet's RPT review had been "tainted by procedural irregularities," it found no evidence of national-origin bias. See Part I.A.5.b., supra. Nor has Doucet pointed to other evidence that could support a reasonable inference that the alleged irregularities were driven by national-origin bias. For instance, while Doucet suggests that her student evaluation scores were artificially depressed by the inclusion of at least one CAD course she regarded herself as unqualified to teach, there is no indication that national-origin bias—as opposed to resource or other legitimate considerations—motivated the School's course assignments.

*Id.* at ** 59-61.

Here, just like Doucet, Dr. McTague argues that review of her reappointment application was tainted by procedural errors, *i.e.*, that the reviewing faculty misapplied the RPT criteria and imposed arbitrary publication requirements. (Doc. 70 at 63). However, just like Doucet, Dr. McTague has not set forth any direct or circumstantial evidence from which the Court could infer that those irregularities were the result of gender discrimination. The RPT document does not require tenure-track faculty to publish a precise number of articles; it requires that they maintain an "active research program." (Doc. 39-2 at 65). The evidence suggests that Dr. Tong, Dr. Stepinski and Dr. Beck had different opinions as to how many articles constituted an "active research program" and why, but there is no evidence to suggest their respective determinations were influenced, in any way, by Dr. McTague's gender.

34

The Court's conclusion is bolstered by the fact that Dr. McTague cannot demonstrate that she was subject to a "heightened" publications standard compared to her male colleagues. Dr. McTague argues some of her reviewers evaluated her application under the assumption that she would have to publish six articles in her six years on tenure track to be granted tenure (one article per year), and others under the assumption that she would have to publish five articles in six years (fewer than one article per year).[6] In comparison, Dr. Beck was granted tenure after publishing two articles in the two years he was on tenure track (one article per year) and Dr. Kim was granted tenure after publishing five articles in the four years he was on tenure track (more than one article per year). Not only does Dr. McTague fail to present any evidence that these alleged publication requirements were imposed due to her gender, but she fails to demonstrate that they are higher than those applied to her male colleagues.

Second, Dr. McTague takes issue with Dean Jackson's May 17, 2013 recommendation, in which Dean Jackson states that he had hoped the Memorandum of Understanding would allow Dr. McTague to publish at least 2-4 additional papers, and that he told Dr. McTague she "would need to get something published in order for me to support her reappointment." Dr. McTague claims this recommendation is "disingenuous" because she submitted two additional articles prior to submitting her 2013 application,

---

[6] To the extent Dr. McTague suggests she was subject to a seven article requirement, the only evidence to support this argument is Dr. Beck's testimony that he thought "some of the people were using maybe [a] five to seven [publication requirement]." (Doc. 46 at 22). That statement is inadmissible hearsay and cannot preclude summary judgment.

and because she discussed tenure—not reappointment—with Dean Jackson. (Doc. 70 at 64).

The Court does not agree. Dean Jackson's recommendation said he hoped the Memorandum of Understanding would help Dr. McTague get at least 2-4 additional papers <u>accepted for publication</u>. (Doc. 40-2 at 51). At the time he reviewed Dr. McTague's application for reappointment in May, 2013, she did not have <u>any</u> additional articles accepted for publication. (Doc. 70-2 at ¶¶ 30-32). Further, even if Dean Jackson and Dr. McTague only discussed requirements for tenure, per the Geography Department RPT document, Dean Jackson was instructed to vote for reappointment only if he thought tenure was likely. (Doc. 39-2 at 65). The evidence is that he did not.

There is simply nothing to suggest it is "more likely than not" that UC's reason for denying Dr. McTague's application for reappointment—her lack of publications—is pretext for discrimination or that its explanation, which is supported by years of documented concerns, is unworthy of credence. Accordingly, UC's motion for summary judgment on Dr. McTague's claim for Title VII discrimination is **GRANTED**.

### 3. *Retaliation*

Dr. McTague claims that UC violated Title VII by denying her 2013 application for reappointment in retaliation for her complaining about gender discrimination.

Title VII prohibits an employer from discriminating against any employee "because he has opposed any practice made an unlawful practice by [Title VII], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3.

In an action under Title VII, the plaintiff may prove unlawful retaliation by either (1) presenting direct evidence of retaliation or (2) by raising an inference of retaliation. *See Novotny v. Reed Elsevier,* No. C-3-05-424, 2007 U.S. Dist. LEXIS 66608, at * 65 (S.D. Ohio Sept. 10, 2007) (citation omitted).

Direct evidence is evidence which, if believed, *requires* the conclusion that unlawful retaliation was a motivating factor in the employer's action. *Abbott v. Crown Motor Co.*, 348 F.3d 537, 542 (6th Cir. 2003) (citing *Laderach v. U-Haul of Northwestern Ohio*, 207 F.3d 825 (6th Cir. 2000)). Stated another way, evidence is "direct" if it is capable of proving unlawful retaliation "without any inferences or presumptions." *Id.*

Here, Dr. McTague has not presented any direct evidence of retaliation and instead asks the Court to infer retaliation from the timing and circumstances of the denial of her reappointment. Therefore, like the Title VII discrimination claim, this claim will be reviewed using the *McDonnell Douglas* burden shifting analysis. *Novotny*, 2007 U.S. Dist. LEXIS 66608, at * 65 (citation omitted).

Under the first step, Dr. McTague must establish a *prima facie* retaliation case by showing (1) she engaged in a protected activity, (2) UC knew about the protected activity, (3) UC took an adverse employment action against Dr. McTague, and (4) there was a causal connection between the protected activity and the adverse action. *See Smith v. City of Salem*, 378 F.3d 566, 570 (6th Cir. 2004).

### a. Dr. McTague's *prima facie* case fails.

Viewing the evidence in the light most favorable to Dr. McTague, the Court finds there is an issue of fact as to the first three factors, *i.e.*, whether Dr. McTague's

complaints constitute a "protected activity," whether UC knew about the protected activity, and whether UC took an adverse employment action against Dr. McTague by denying her application for reappointment. The Court finds that Dr. McTague's *prima facie* case fails, however, because she cannot demonstrate a causal connection between her complaints regarding discrimination in the Geography Department and UC's denial of her application for reappointment.

According to the Sixth Circuit, to establish a causal connection, a plaintiff must "proffer evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action." *EEOC v. Avery Dennison Corp.*, 104 F.3d 858 (6th Cir. 1997) (quotation omitted). The plaintiff must produce "sufficient evidence from which one could draw an inference that the employer would not have taken the adverse action against the plaintiff had the employer not engaged in activity that Title VII protects." *Abbott v. Crown Motor Co., Inc.*, 348 F.3d 537, 543 (6th Cir. 2003).

Here, Plaintiff has not proffered evidence that her complaints regarding discrimination in 2012 were the "likely" reason for the denial of her reappointment application. During Dr. McTague's application for reappointment in 2009, four of the five levels of review expressed concerns about her research. During her application in 2011, all five levels of review expressed concerns about her research, the Geography Department faculty and Department Head Dr. Liu expressed doubt as to whether her research record could support a successful tenure application in a few years, and Dean Hardcastle <u>voted against reappointment</u> because she did "not see any realistic way" in

which Dr. McTague would be able to fulfill tenure and promotion requirements in two years.

In light of the facts that (1) Dr. McTague had already received a vote against reappointment on account of her research record in 2011, (2) concerns about Dr. McTague's research production were documented as far back as 2009, and (3) there is no evidence of other employees, who did not engage in a protected activity, being reappointed after publishing just two articles in five years, the Court simply cannot infer that UC would have approved Dr. McTague's 2013 application for reappointment had she not complained about discrimination in 2012.

### b. UC has a legitimate, non-discriminatory reason.

Even assuming, *arguendo*, Plaintiff had presented a *prima facie* retaliation case, that would not end the inquiry—the burden would shift to Defendant to articulate a non-discriminatory reason for its decision. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 562 (6th Cir. 2008) (citation omitted). As explained *supra*, UC's proffered reason for denying Dr. McTague's application for reappointment—her lack of publications—is a legitimate, non-discriminatory reason. *See Lynn v. Regents of Univ. of Cal.*, 656 F.2d at 1344.

### c. There is no evidence of pretext.

Dr. McTague asserts two arguments as to why UC's reliance on her lack of publications is pretext for unlawful retaliation. First, Dr. McTague argues that her application for reappointment was not evaluated fairly. Dr. McTague repeats her argument that faculty members applied erroneous publication standards. She also argues

Dr. Liu did not "truly evaluate" her application, as indicated by the fact that he uploaded his recommendation against reappointment only seven hours after Dr. McTague's dossier was available. (Doc. 70 at 76-78).

This argument is not well-taken. The Court is not a super-tenure committee. It is not the Court's job to ensure that faculty members properly evaluated Dr. McTague's application for reappointment or that Dr. Liu read every word in her dossier. It is the Court's job to ensure that UC's proffered reason for denying her application—insufficient publications—is not pretext for unlawful retaliation. In light of the years of documented concerns regarding Dr. McTague's research and publications, the proffered reason is not pretext for unlawful retaliation.

Second, Dr. McTague argues UC did not react appropriately to her complaints. Specifically, Dr. McTague argues there is no evidence that Dr. Tong or Mr. Nienaber requested or initiated an investigation into her complaints. (Doc. 70 at 78-79). Dr. McTague also takes issue with the fact that, upon hearing of her complaints, Dean Jackson remarked that Dr. McTague was not willing to "work hard" to achieve tenure, instead of commenting out of concern for her supposedly inequitable treatment. (*Id.* at 78).

The Court disagrees. The (limited) evidence on this issue is that, upon hearing Dr. Tong was concerned Dr. McTague might sue UC if her tenure application was denied: (1) Mr. Nienaber requested a meeting with Mr. Bryan, Dr. Tong and Dr. Liu, and (2) Dean Jackson responded that threatening litigation prior to a tenure decision would suggest Dr. McTague had "no intent of working hard" to achieve tenure, but that he

40

"really want[ed] her to succeed with getting tenure" and "[w]e will do all we can in the college to support her in her quest for tenure." (Doc. 67-1 at 17-18). The Court cannot infer a retaliatory motive from these limited facts.

For these reasons, UC's motion for summary judgment is **GRANTED** on Dr. McTague's claim for Title VII retaliation.

## B. Equal Pay Act.

The EPA states that no employer shall discriminate "between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on the jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions [.]" 29 U.S.C. § 206(d)(1).

### 1. Dr. McTague has set forth a prima facie case.

To establish a *prima facie* EPA claim, a plaintiff must show that an employer paid different wages to an employee of the opposite sex for substantially equal work. *Kovacevich v. Kent State Univ.*, 224 F.3d 806, 826 (6th Cir. 2000) (citation omitted). "Equal work" does not require that the jobs be identical, but only that there exist "substantial equality of skill, effort, responsibility and working conditions." *Id.*

Dr. McTague argues she has asserted a *prima facie* EPA claim because (1) she performed substantially equal work to Dr. Kim, Dr. Beck, and Dr. Widener (while they were tenure-track Assistant Professors in the Geography Department) and (2) Dr. McTague was compensated less than each of these professors. (Doc. 70 at 39-42).

The Court agrees that Plaintiff has she has asserted a *prima facie* EPA claim. Dr. McTague, Dr. Kim, Dr. Beck and Dr. Widener were each (at one point) Assistant Professors in the Geography Department, and their positions were governed by the Geography Department's RPT document. (*See* Doc. 39-1 at 32; Doc. 68-1 at 118; Doc. 68-1 at 116). During their tenure as Assistant Professors, Dr. McTague was paid less than Dr. Kim, Dr. Beck and Dr. Widener. (*Id.*; Doc. 48-1 at 37-46). Viewing the facts in a light most favorable to Dr. McTague, she has made a *prima facie* showing that she was paid less than male Assistant Professors for equal work.

### 2. UC has not met its burden of proof on its affirmative defenses.

Once the plaintiff establishes a *prima facie* EPA case, the defendant must prove by a preponderance of the evidence that the wage differential is justified under an affirmative defense set forth in the EPA, *i.e.*, that the payments were made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex. *Id.*; 29 U.S.C. § 206(d)(1).

Unlike the Title VII framework, in which defendants only have to <u>assert</u> a legitimate, non-discriminatory reason for the treatment at issue, under the EPA, a defendant bears the burden of <u>proof</u> in establishing an affirmative defense. *Perkins v. Rock-Tenn Servs., Inc.*, No. 16-1798, 2017 U.S. App. LEXIS 11772, at * 10 (6th Cir. June 30, 2017); *see also Beck-Wilson v. Principi*, 441 F.3d 353, 365 (6th Cir. 2006) (stating that an EPA defendant "bears both the burden of persuasion and production on its affirmative defenses."). To be entitled to summary judgment, an EPA defendant must

establish its defense "so clearly that no rational jury could have found to the contrary."
*Principi*, 441 F.3d at 365 (citation omitted).  According to the Sixth Circuit, a defendant's
burden is "a heavy one."  *Id.*

Here, UC argues that the salary differences are due to factors "other than sex."
Defendant argues that the salaries of Dr. Kim and Dr. Widener were the result of "market
forces;" specifically, these professors were external candidates to whom UC had to offer
salaries which were competitive in the national market.  (Doc. 50 at 54).  UC also argues
that the salaries of Dr. Kim, Dr. Beck, and Dr. Widener were based on the fact that they
were candidates with established research records, whereas Dr. McTague was hired as an
assistant professor from her field service position, and did not have a research record.
(Doc. 72 at 31).

The Court agrees with UC that market factors involved in hiring external
candidates, as well as candidates' publication records, constitute factors "other than sex"
for purposes of an EPA claim.  However, the Court finds that UC has not met its burden
of proof on these affirmative defenses.

Dr. Kim was hired as a tenure-track Assistant Professor in 2008 at a salary of
$66,000.  (Doc. 65 at ¶ 45; Doc. 39-1 at 32).  Dean Hardcastle testified that Dr. Kim was
employed as a tenure-track faculty member at Minnesota State, and she "would have to
beat, in effect, his salary that he was getting there."  (Doc. 43 at 71-72).  Dr. Liu, who
"played a role" in setting Dr. Kim's salary, testified that Dr. Kim warranted a salary of
$66,000 due to his publications, though he could not remember the "details" of Dr. Kim's
publications.  (Doc. 48 at 17-18).

The Court finds these conclusory allegations insufficient to meet the "heavy" burden of proof imposed on an EPA defendant.

UC has not proven that Dr. Kim's salary was required to "beat" what he was receiving at Minnesota State because neither Dean Hardcastle nor Dr. Liu testified what Dr. Kim's salary was at Minnesota State. UC has not proven that Dr. Kim's salary was justified because of his publications record because neither Dean Hardcastle nor Dr. Liu knew the details of those publications and there is no analysis from which this Court could conclude that the publications warranted a salary $14,000 higher than Dr. McTague was offered just one year prior.

Dr. Beck was hired as a tenure-track Assistant Professor in 2009 at a salary of $68,000. (Doc. 65 at ¶ 60; Doc. 68-1 at 116). Dean Hardcastle testified that she remembered talking to Dr. Liu about "what [Dr. Beck] had done in terms of research and grant scholars[.]" (Doc. 43 at 10). Dr. Liu testified that Dr. Beck's salary was "based on [his] merit" and the fact that he "had a long list of publications" and "several large research grants." (Doc. 48 at 23).

Again, this limited evidence is insufficient to meet UC's burden of proof. There is no evidence, analysis or argument indicating why Dr. Beck's merit, grants, or publications warranted a salary $16,000 higher than what Dr. McTague was offered two years prior. The conclusory allegations relied on by UC simply do not establish its affirmative defense "so clearly that no rational jury" could find otherwise.

Finally, Dr. Widener was hired as a tenure-track Assistant Professor in 2012 at a salary of $70,000. (Doc. 48 at 45-46; Doc. 68-1 at 118). At the time, Dr. Widener had

not received his Doctorate degree. (Doc. 68-1 at 118). The only evidence justifying Dr. Widener's salary is Dr. Liu's testimony that it was:

> based on two [factors]: One is the market rate, and the other one is his merit. At the time of application, he had six to seven refereed publications in top journals. And at the time of employment, I think he had eight or nine, which is—it's very good, good publication record.

(Doc. 48 at 48).

Dean Hardcastle could not recall how $70,000 came about, and speculated it was based on market rate:

> So if [Dr. Widener] was coming from another position it would be: I need to beat whatever his current salary was. If it's not, then it's the market rate, the national market rate.

(Doc. 43 at 75).

Again, this limited evidence is insufficient to meet UC's burden of proof. There is no evidence as to what the "market rate" was for Dr. Widener, only speculation that what he was offered was, in fact, the market rate. While it appears Dr. Widener had a superior research background compared to Dr. McTague, Dr. Liu's statement that he "thinks" Dr. Widener had a good publication record is insufficient to establish that the disparity between Dr. Widener's and Dr. McTague's salaries was based on a factor other than sex "so clearly that no rational jury" could find otherwise, especially when Dr. Widener had not even received his Doctorate degree at the time he was hired, yet was offered a higher salary than Dr. McTague ever received, even after several years as a tenure-track professor.

In conclusion, UC has set forth legitimate reasons, other than sex, that could explain why Dr. McTague was paid less than the male Assistant Professors in the Geography Department. UC may ultimately prevail on these defenses at trial. But at this stage, the evidence identified by UC is simply too speculative and scarce for the Court to find it has met its "heavy" burden of proof on these affirmative defenses. Accordingly, UC's motion for summary judgment is **DENIED** as to Dr. McTague's claim for violation of the EPA.

### C. FMLA Interference and Retaliation.

#### 1. Dr. McTague's FMLA Interference Claim fails.

To prevail on an FMLA interference claim, a plaintiff must establish that: (1) she was an eligible employee; (2) the defendant was an employer as defined under the FMLA; (3) the employee was entitled to leave under the FMLA; (4) the employee gave the employer notice of her intention to take leave; and (5) the employer denied the employee FMLA benefits to which she was entitled. *See Rush v. E.I. DuPont De Nemours & Co.*, 911 F. Supp. 2d 545, 558 (S.D. Ohio 2012). The employer's intent is not a relevant part of an FMLA interference claim. *Edgar v. JAC Prods.*, 443 F.3d 501, 507 (6th Cir. 2006).

UC argues that Dr. McTague cannot establish the fifth prong, *i.e.*, that UC denied Dr. McTague FMLA benefits to which she was entitled. (Doc. 50 at 56). It is undisputed that Dr. McTague received the 12 weeks of FMLA leave to which she was entitled, was allowed to take additional leave for the remainder of the 2011-2012 academic year, and received an accompanying one-year extension on her applications for reappointment and

tenure.  Still, Dr. McTague argues that UC interfered with her FMLA leave by
(1) requiring Dr. McTague to meet with graduate students while on leave and
(2) requiring Dr. McTague to conduct research while on leave and considering whether
Dr. McTague had submitted or published any papers during her FMLA leave while
evaluating her application for reappointment.  The Court does not agree.

      **a.   There is no evidence UC required Dr. McTague to meet with
           students while on FMLA leave.**

Dr. McTague has not set forth any evidence that UC interfered with her FMLA
leave by requiring her to meet with students.  Dr. Wendy Eisner told Dr. McTague that
she would "take care of the students' needs and questions, and will be advising them to
the best of [her] ability" while Dr. McTague was on leave.  (Doc. 39 at 305, Doc. 39-5 at
1).  Dr. McTague did not believe Dr. Eisner was doing a sufficient job in her stead, and
met with some of her students because she did not perceive them to be receiving the
assistance they required. (Doc. 39 at 306-07).  However, Dr. McTague testified that UC
did not require her to meet with students while on leave:

> Q.     Okay. Did anyone tell you you've got to go meet with this graduate
>           student, you know, while you were out on FMLA?
>
> A.     The graduate students – I think this was a different issue.  No one
>           said I had to, but they were definitely being harmed.
>
> Q.     You felt like they needed your assistance?
>
> A.     And it could have been detrimental to their timely graduation.
>
> Q.     Okay.  But no one in the department told you you have to meet with
>           this graduate student?
>
> A.     No.

(Doc. 39 at 316:9-18).

In light of Dr. McTague's admission that UC did not instruct her to meet with students while on leave, and the fact that she does not point to evidence demonstrating that she objected to meeting with these students, or that she asked UC to remedy the situation, the evidence is that these meetings were voluntary, and, accordingly, they cannot support an FMLA interference claim. *See Soehner v. Time Warner Cable, Inc.*, No. 1:08-cv-166, 2009 U.S. Dist. LEXIS 106619 at ** 12-14 (S.D. Ohio Nov. 16, 2009) (Black, J) (finding no FMLA interference where plaintiff "chose" to work while on leave without informing his supervisor that he did not want to work or was too fatigued to do so).

### b. There is no evidence UC required Dr. McTague to conduct research or work on publications while on FMLA leave.

Dr. McTague argues that UC required her to conduct research and work on publications while on FMLA leave, and that UC's decision to not reappoint her was based, in part, on the fact that she did not publish any articles during her FMLA leave. (Doc. 70 at 23-27). The evidence is otherwise.

First, Dr. McTague does not have any evidence that she was instructed to conduct research or work on publications. Dr. McTague did not know, and could not remember, whether any professor in the Geography Department told her to work on her RPT folder while out on FMLA or sick leave. (Doc. 39 at 317). Instead, she testified that she "think[s] there were people who viewed [her] FMLA leave as time that [she] was supposed to be producing research," and the pressure to do research "was there, whether

someone said it or not." (Doc. 40 at 194-95). This vague, conclusory testimony is insufficient to create a genuine issue of material fact as to whether UC required Dr. McTague to conduct research or publish articles while on leave.

Dr. McTague argues that emails from Dr. Tong and Ms. Herman suggested that she needed to "make progress" on her RPT folder. (Doc. 70 at 23). The Court does not agree. Ms. Herman was Dr. McTague's AAUP representative, not Dr. McTague's supervisor, and Ms. Herman's statement that she "hope[d]" on a "personal level" that Dr. McTague would have time to work on her RPT folder does not suggest that Dr. McTague was <u>required</u> to do so <u>by UC</u> while on leave. (Doc. 39-5 at 9). Similarly, Dr. Tong's statement in 2011 that one "option" for Dr. McTague was to "take a family leave" to "buy some time" was just that—an option—suggested by Dr. Tong while she was "brainstorming" ideas to help Dr. McTague. (Doc. 39-4 at 8). Even if Dr. Tong was implying that Dr. McTague <u>could</u> use her FMLA leave to improve her RPT folder in anticipation of her next application for reappointment, there is still no evidence that Dr. McTague was <u>required by UC</u> to conduct research once she took FMLA leave.

Second, Dr. McTague does not have any evidence that her FMLA leave was "used against her" in her 2013 reappointment evaluation. Dr. McTague's entire evidence on this point is Dr. Dunning's testimony that, during the Geography Department RPT committee meeting, Dr. Stepinski made a comment "to the effect of, 'Well, we all know [Dr. McTague] has actually had two years'" since her last application for reappointment. (Doc. 41 at 5-16).

This statement is insufficient to create a material issue of fact.  Initially, the statement is factually accurate.  When Dr. McTague applied for reappointment in February, 2011, she was awarded a one-year reappointment.  When Dr. McTague took FMLA for one academic year, UC extended her reappointment period for one year as well, with the result that her next application for reappointment was due in the spring of 2013, instead of the spring of 2012.  (Doc. 40-1 at 14).

Dr. McTague asks the Court to infer from Dr. Stepinski's statement that he was instructing other faculty members to consider whether Dr. McTague conducted research or published articles during the 10 months she was on FMLA leave.  (Doc. 70 at 25).  The Court cannot/will not make that inference.  While considering a motion for summary judgment, courts are compelled to draw all inferences in favor of the nonmoving party "to the extent supported by the record."  *Scott v. Harris*, 550 U.S. 372, 381, n.8 (2007) (emphasis supplied).  There is nothing in the record to support Dr. McTague's interpretation of Dr. Stepinski's statement, which is presented as hearsay and without any context or foundation.  Tellingly, not one faculty member testified that he/she considered Dr. McTague's FMLA leave to be a period of time she was expected to be researching and publishing articles.  Further, Dr. Tong, who was the Interim Geography Department Head, and present at the RPT committee meeting where Dr. Stepinski made this comment, correctly stated in her recommendation that, by August 2014, Dr. McTague would have been a tenure-track assistant professor for six years.[7]  (Doc. 40-2 at 83).

---

[7] The Court notes that fall 2007 to fall 2014, minus the 2011-2012 academic year Dr. McTague was on leave, is six academic years.

Finally, even if the Court were to construe Dr. Stepinski's statement that Dr. McTague "had two years" as an instruction that faculty were to consider whether Dr. McTague published any articles while on FMLA leave, UC would still be entitled to summary judgment. As the Sixth Circuit has explained, the FMLA is not a strict liability statute, and employees seeking relief under the theory that they have been denied benefits to which they are entitled must establish that the employer's violation caused them harm. *Edgar v. JAC Prods.*, 443 F.3d 501, 507-08 (6th Cir. 2006). An employer is entitled to summary judgment on an FMLA interference claim if the employee is unable to make a showing of prejudice. *See Coker v. McFaul*, 247 Fed. Appx. 609, 619 (6th Cir. 2007).

Here, even if Dr. McTague could demonstrate that faculty members considered her year of leave while evaluating her 2013 reappointment application (and she cannot), she cannot demonstrate prejudice because there is no evidence to remotely suggest she would have successfully been reappointed if the 2011-2012 academic year had been completely excluded from her review. First, there is no direct evidence on this point, as no faculty member testified Dr. McTague would have been reappointed if not for consideration of her FMLA leave. Second, Dr. Stepinski, who supposedly made the comment at issue, testified that Dr. McTague's research production was insufficient to warrant reappointment even if her year of leave was excluded. (Doc. 37 at 121-22). Third, Interim Department Head Dr. Tong properly excluded Dr. McTague's year of FMLA leave and still voted against reappointment. (Doc. 40-2 at 83). Fourth, Dr. McTague cannot show prejudice through circumstantial evidence, because she cannot identify any other faculty member who was reappointed after publishing just two articles

in five years, or who was granted tenure after publishing just three articles in six years. The record simply does not contain any evidence from which this Court could infer Dr. Stepinski's comment resulted in prejudice to Dr. McTague.

Accordingly, UC's motion for summary judgment is **GRANTED** as to Dr. McTague's claim for FMLA interference.

### 2. *Dr. McTague's FMLA Retaliation Claim fails*.

Dr. McTague claims UC denied her 2013 application for reappointment in retaliation for her taking FMLA leave. The Court does not agree.

Employers may not "discriminat[e] against employees . . . who have used FMLA leave,' nor can they 'use the taking of FMLA leave as a negative factor in employment actions." *Travers v. Cellco P'Ship*, 579 Fed. Appx. 409, 415 (6th Cir. 2014) (citation omitted). The court applies the familiar *McDonnell Douglas* burden-shifting test to FMLA retaliation claims. *Edgar*, 443 F.3d at 508. A plaintiff can make a prima facie case of discrimination by showing that (1) she availed herself of a protected right under the FMLA by notifying her employer of her intent to take leave, (2) she suffered an adverse employment action, and (3) that there was a causal connection between the exercise of her rights under the FMLA and the adverse employment action. *Id.*

If the employee satisfies these three requirements, the burden shifts to the employer to proffer a legitimate, nondiscriminatory rationale for discharging the employee. *Id.* If the employer proffers a legitimate reason, the burden shifts to the employee to show pretext—that is, that the employer's reason was false and that the real

reason for the employee's termination was FMLA retaliation. *Travers v. Cellco P'ship*, 579 Fed. Appx. 409, 416 (6th Cir. 2014).

Here, UC has proffered a legitimate reason for the denial of her reappointment—insufficient research—and Dr. McTague cannot demonstrate that reason is pretext for unlawful retaliation.

Dr. McTague sets forth three arguments she claims indicates UC's proffered reason is pretext for FMLA retaliation: (1) UC imposed a six-publication requirement to Dr. McTague's application compared to a three-publication requirement established prior to her FMLA leave; (2) the newly imposed requirement of six publications was neither reflected in nor consistent with any Departmental requirements or documented RPT standards; and (3) other faculty members in the Department, including Dr. Kim and Dr. Beck, who had not taken FMLA leave, were not subject to the six publication requirement, yet they were granted tenure. (Doc. 70 at 34). The Court does not agree.

Dr. McTague's first argument fails because there is no evidence that Dr. McTague was <u>ever</u> subject to a three-publication requirement (for tenure or for reappointment) prior to taking FMLA leave. Dr. McTague is apparently relying on Dr. Tong's April 6, 2011 email, in which Dr. Tong suggests that Dr. McTague "get two papers out ASAP, and embark on a short project and get a publication or two out in a year or so[.]" (Doc. 39-4 at 8). Dr. Tong made this suggestion (among others) while "brainstorming" some "options" to help Dr. McTague, and never indicated that three publications would be sufficient to secure reappointment or tenure. (*Id.*) Accordingly, Dr. Tong did not "move the target" when evaluating Dr. McTague's reappointment application under the

assumption that she would have to have six articles published by the time she applied for tenure in 2014 (after completing six years as a tenure-track Assistant Professor).

As to Dr. McTague's second and third arguments, they fail for the reasons set forth in Section VI(A)(2), *supra*: the Court is not concerned with whether faculty members imposed the "right" publication requirements in the absence of any evidence of unlawful retaliation, and there is no evidence that Dr. McTague—who had published two articles in five years at the time she applied for reappointment in 2013—was subject to higher publication standards than Dr. Kim and Dr. Beck, both of whom had a record of publishing <u>at least</u> one paper per year during their time as tenure-track Assistant Professors.

UC's decision to deny Dr. McTague's 2013 application for reappointment is consistent with documented concerns regarding her research as far back as 2009. There is no evidence from which this Court could infer FMLA retaliation was the "real" reason for the denial. Accordingly, UC's motion for summary judgment is **GRANTED** as to Dr. McTague's claim for FMLA retaliation.

# V.  CONCLUSION

For these reasons:

1.  UC's motion for summary judgment (Doc. 50) is **GRANTED** as to Dr. McTague's claims for Title VII gender discrimination (Count I), Title VII retaliation (Count II), and FMLA interference and retaliation (Count IV); and

2.  UC's motion for summary judgment (Doc. 50) is **DENIED** as to Dr. McTague's claim for violation of the Equal Pay Act (Count III).

**IT IS SO ORDERED**.

Date:  ___9/25/17___

Timothy S. Black
United States District Judge